OFFICE COPY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

JAMES EASTMAN, On Behalf of Himself
and All Others Similarly Situated,

                Plaintiff,

v.

MERRILL LYNCH & CO., INC., E.
STANLEY O'NEAL, LOUIS DIMARIA,
ALBERTO CRIBIORE, ARMANDO M.
CODINA, VIRGIS W. COLBERT, JOHN D.
FINNEGAN, AULANA L. PETERS,
CHARLES O ROSSOTTI, JILL K.
CONWAY, CAROL T. CHRIST, JUDITH
MAYHEW JONAS, JOSEPH W. PRUEHER,
ANN N. REESE, DAVID K. NEWBIGGING,
THE INVESTMENT COMMITTEE OF THE
MERRILL LYNCH & CO., INC. 401(K)
SAVINGS AND INVESTMENT PLAN, THE
ADMINISTRATIVE COMMITTEE OF THE
MERRILL LYNCH 401(K) SAVINGS AND
INVESTMENT PLAN, and JOHN DOES 1-
20,

                Defendants.

Civil Action No. **08 CV 0058**

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
EMPLOYEE RETIREMENT
INCOME SECURITY ACT OF 1974**



RECEIVED
JAN 04 2008
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, participant in the Merrill Lynch & Co., Inc. 401(k) Savings & Investment Plan

(the "401(k) Plan"), Retirement Accumulation Plan (the "RAP") and Employee Stock Ownership

Plan (the "ESOP")[1] during the proposed Class Period, on behalf of the Plans, himself, and all

others similarly situated, alleges as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this suit as a civil enforcement action under the Employee

Retirement Income Security Act of 1974 ("ERISA") §§ 409, 502(a)(2), and(3), 29 U.S.C. §§

1109 and 1132(a)(2), (3), for relief on behalf of the Plans. The Plans are retirement plans

---

[1]      The ESOP, the RAP and the 401(k) Plan are collectively referred to herein as the "Plans."

operated and established by Merrill Lynch & Co., Inc. ("Merrill Lynch" or the "Company") as a benefit for its employees to permit tax-advantaged savings for retirement and other long-term goals. Merrill Lynch common stock is one of the investments offered in the 401(k) Plan and the RAP, and the only investment offered in the ESOP. According to the Company's Form 11-K filed with the U.S. Securities and Exchange Commission ("SEC") on June 26, 2007 (the "2006 11-K"), in excess of $1.5 billion of the 401(k) Plan's $5.5 billion or more in assets were invested in Merrill Lynch Stock. According to Form 5500 Annual Reports filed by Merrill Lynch with the U.S. Department of Labor and the U.S. Department of the Treasury in October 2006, $948 million of the RAP's $2.4 billion in assets were invested in Merrill Lynch Stock and $1.762 billion of the ESOP's $1.763 billion in assets were invested in Merrill Lynch Stock. Indeed, the Plans were heavily invested in Merrill Lynch Stock at all times relevant to this action, as discussed herein.

2.      Plaintiff James Eastman was a participant in the Plans during the class period of January 18, 2007, through the present (the "Class Period"). His retirement portfolio included Merrill Lynch Stock during the Class Period.

3.      Plaintiff alleges that Defendants, as fiduciaries of the Plans, breached their duties to them and to other participants and beneficiaries of the Plans during the Class Period in violation of ERISA, particularly with regard to the Plans' holdings of Merrill Lynch Stock.

4.      Merrill Lynch is the sponsor of the Plans.

5.      Since the Plans' holdings in Merrill Lynch Stock comprised a significant percentage of the overall value of the assets held by the Plans, the long-term retirement savings of the Plans' participants were dependent to a substantial degree both on the performance of Merrill Lynch Stock, as well as the related need for prudent fiduciary decisions by Defendants

concerning such a large, ongoing investment of assets of the Plans. This action alleges that the fiduciaries of the Plans breached their fiduciary duties to the Plans and their participants under ERISA, by, inter alia, selecting and maintaining Company Stock as an investment alternative for participant contributions and Company matching contributions, when it was no longer a suitable or prudent investment option for the Plans.

6.    The breaches were ongoing and arose out of Defendants' continuing duties to review, evaluate, and monitor the suitability of the Plans' investment in Merrill Lynch Stock, and to provide accurate material information to enable participants to make informed investment decisions concerning their holdings invested in Company Stock.

7.    The basic prudence allegations arise from the fact that Defendants knew, or should have known, that Merrill Lynch was engaging in risky and unsound business practices in connection with its investments in collateralized debt obligations, including its exposure to the subprime credit market, which have rendered Merrill Lynch Stock an imprudent, inappropriate and extraordinarily risky investment for the retirement savings of the Plans' participants.

8.    As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plans have suffered substantial damages, including the erosion of hundreds of millions of dollars of retirement savings and anticipated retirement income for the Plans' participants. Indeed, the Plans' participants have seen their retirement savings accounts devastated as Company Stock plummeted from a high of approximately $98 per share near the beginning of the Class Period to a price of approximately $59 per share at the end of the Class Period. Under ERISA, the breaching fiduciaries are obligated to restore to the Plans the losses resulting from these fiduciary breaches.

9.     Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for Plan-wide relief for breach of fiduciary duty, Plaintiff brings this case as a class action on behalf of all participants and beneficiaries of the Plans during the Class Period. Plaintiff also brings this action as participants seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plans.

10.     Because much of the information and documents on which Plaintiff's claims are based are solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the claims below.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.     This Court has personal jurisdiction over Defendants under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), as one or more of the Defendants may be found in this District. The Court also has personal jurisdiction over Defendants because the Company maintains executive offices in this District, and the Plans are administered within this District. Defendants systematically and continuously have done and continue to do business in this District, and this case arises out of Defendants' acts within this District.

13.     Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because Defendants administer the Plans in this District, some or all of the actionable conduct for which relief is sought occurred in this District, and/or one or more of the Defendants reside or may be found in this District.

## THE PARTIES

### Plaintiff

14.    Plaintiff James Eastman is a resident of Saginaw, Michigan.  He was a participant

in the Plans, within the meaning of ERISA § 3(7) and 502(a), 29 U.S.C. § 1102(7) and §1132(a),

and was a participant in both the 401(k) Plan RAP and the ESOP during the Class Period.

During the Class Period, Plaintiff Eastman held Merrill Lynch Stock in his individual ESOP,

RAP and 401(k) Plan accounts.

### Corporate Defendants

15.    Defendant Merrill Lynch is a Delaware corporation with its principal place of

business located at 4 World Financial Center, New York, NY 10080.  Through its broker, dealer,

banking, insurance, and other financial services subsidiaries, Merrill Lynch provides investment,

financing, insurance and related services to individuals and institutions on a global basis.

16.    Upon information and belief, Merrill Lynch at all times acted through its officers,

directors and employees, including the Chief Executive Officer ("CEO").  Merrill Lynch had, at

all times relevant herein, effective control over the activities of its officers and employees,

including their Plan-related activities.  Merrill Lynch exercises ultimate discretionary decisional

authority with respect to all aspects of the administration of the Plans, management and

disposition of the Plans' assets, and appointment and removal of fiduciaries through its

management employees, Merrill Lynch's Board of Directors (the "Board"), Administrative

Committee and/or Investment Committee (terms are defined herein).

17.    Upon information and belief, under the terms of the Plans, Merrill Lynch was

given direct control and management over any aspect of the operation, or administration of the

Plans that was not specifically delegated to the named fiduciaries under the Plans and upon

information and belief, exercised this control.  Upon information and belief, the Plans name

Merrill Lynch as the administrator, as that term is defined in Section 3(16) of ERISA 29 U.S.C. § 1002(16). Under ERISA, a plan administrator is inherently a fiduciary.

18.    As a matter of corporate law, Merrill Lynch is imputed with the knowledge that its Board and management employees had of the misconduct alleged herein, even if not communicated to Merrill Lynch.

19.    Upon information and belief, Merrill Lynch, together with its Board, exercised responsibility for communicating with participants regarding the Plans, and providing participants with information and materials required by ERISA. In this regard Merrill Lynch, together with the Board, drafted and disseminated various documents and materials related to the Plans, including but not limited to, a Summary Plan Description ("SPD") and the documents incorporated into the SPD. Based on the allegations contained herein, Merrill Lynch is a fiduciary with respect to the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority or control with respect to the management of the Plans' assets, and exercised discretionary authority and control with respect to the appointment of other Plan fiduciaries.

20.    ***The Board***. Upon information and belief, the business and affairs of the Company are managed under the direction of the Board, including with respect to the Company's role as a fiduciary of the Plans. One of the many roles or functions of the Board is the power to appoint the members of the Investment Committee and Administrative Committee (as defined below). Upon information and belief, the Board likewise exercised management or control over the Investment Committee and Administrative Committee. Based on the above, the Board is a fiduciary with respect to the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority

or control with respect to the management of the Plans' assets, and exercised discretionary authority and control with respect to the appointment of other Plans' fiduciaries.

(a)    *The Management Development and Compensation Committee.*  The Board's Management Development and Compensation Committee (the "Compensation Committee") has overall responsibility for the review and approval of changes to benefit plans that result in the issuance of stock or material changes to the benefits provided to employees.  Upon information and belief, the Compensation Committee had overall responsibility for the Plans.

21.    ***The Investment Committee.***  Pursuant to a Form 11-K filed with the SEC for the year ended December 31, 2006, for the 401(k) Plan, the 401(k) Plan assigned fiduciary responsibilities to the Investment Committee. The Investment Committee consists of a group of senior executives, excluding any directors or executive officers. The Investment Committee has the authority to designate investment funds for the investment of accounts and to establish rules and procedures with respect to investment funds. All contributions to the Plan may be allocated among any of the available investments selected by the participant from among the investments designated by the Investment Committee.  Upon information and belief, the RAP and ESOP have assigned fiduciary responsibilities to the Investment Committee.  Upon information and belief, members of the Investment Committee are appointed by the Compensation Committee.  Upon information and belief, the Investment Committee is a "Named Fiduciary" under Plans and under § 402(a) of ERISA, 29 U.S.C. § 1102(a).  Upon information and belief, among the powers afforded to the Investment Committee is the ability to direct the investment of the Plans' assets, including buying or selling Company Stock.  Upon information and belief, the Investment Committee has the power to add or remove certain investment options under the Plans.  Upon

information and belief, the Investment Committee also has the power to appoint an investment manager for the Plans. Based on the above, the Investment Committee is a fiduciary with respect to the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority or control with respect to the management of the Plans' assets, and exercised discretionary authority and control with respect to the appointment of other fiduciaries of the Plans.

22.     ***The Administrative Committee.*** The Plans assigned fiduciary responsibilities to an Administrative Committee (the "Administrative Committee"). Upon information and belief, the Administrative Committee is a "Named Fiduciary" under the Plans and under § 402(a) of ERISA, 29 U.S.C. § 1102(a). The Administrative Committee consists of the persons that administer the Plans, and have overall responsibility for their management and operation. Upon information and belief, members of the Administrative Committee are appointed by the Compensation Committee.

**Individual Defendants**

23.     Defendant E. Stanley O'Neal ("O'Neal") served as Merrill Lynch's Chief Executive Officer and Chairman of the Board during the Class Period. O'Neal was a fiduciary in that, in his high-level capacity and role within the Company, he exercised discretionary authority with respect to administration, control and/or management of the Plans.

24.     Defendant Louis DiMaria ("DiMaria") served as the Chairman of the Administrative Committee during the Class Period. DiMaria signed the Form 11-K filed with the SEC for the year ended December 31, 2006, for the 401(k) Plan, and the Forms 5500 for the 401(k), the RAP, and the ESOP filed with the Department of the Treasury and Internal Revenue Service for the 2005 tax year.

25.    Defendant Virgis W. Colbert served as member of the Board during the Class Period.  During the Class Period, Colbert served on the Board's Nominating and Corporate Governance Committee.

26.    Defendant Alberto Cribiore ("Cribiore") served as member of the Board during the Class Period.  During the Class Period, Cribiore served as the Chairman of the Compensation Committee, and as a member of the Board's Finance Committee and Nominating and Corporate Governance Committee.

27.    Defendant Aulana L. Peters ("Peters") served as member of the Board during the Class Period.  During the Class Period, Peters served on the Compensation Committee.

28.    Defendant Charles O. Rossotti ("Rossotti") served as member of the Board during the Class Period.  During the Class Period.  Rossotti served as a member of the Board's Audit Committee, Finance Committee and Nominating and Corporate Goverance Committee.

29.    Defendant Armando M. Codina ("Codina") served as a member of the Board during the Class Period.  During the Class Period, Codina served as a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

30.    Defendant Judith Mayhew Jonas ("Jonas") served as a member of the Board during the Class Period.  During the Class Period, Jonas served on the Audit Committee and the Public Policy and Responsibility Committee.

31.    Defendant Ann N. Reese ("Reese") served as a member of the Board during the Class Period.  During the Class Period, Reese served on the Audit Committee and Finance Committee.

32.     Defendant Jill K. Conway ("Conway") served as a member of the Board during the Class Period. During the Class Period, Conway served on the Compensation Committee and the Nominating and Corporate Governance Committee.

33.     Defendant John D. Finnegan ("Finnegan") served as a member of the Board during the Class Period. During the Class Period, Finnegan served as Chair of the Finance Committee, a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

34.     Defendant David K. Newbigging ("Newbigging") served as a member of the Board during the Class Period. During the Class Period, Newbigging served as Chair of the Audit Committee and as a member of the Public Policy and Responsibility Committee.

35.     Defendant Joseph W. Prueher ("Prueher") served as a member of the Board during the Class Period. During the Class Period, Prueher served as Chair of the Public Policy and Responsibility Committee and as a member of the Audit Committee.

36.     Defendant Carol T. Christ ("Christ") served as a member of the Board during the Class Period. During the Class Period, Christ served on the Public Policy and Responsibility Committee.

37.     The defendants identified in ¶¶ 22 through 36 are sometimes referred to herein as the "Individual Defendants." The Individual Defendants are fiduciaries of the Plans within the meaning of ERISA.

38.     *The Board Defendants.* Merrill Lynch, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, Merrill Lynch relied and continues to rely directly on each of the Board Defendants to carry out its fiduciary

responsibilities under the Plans and ERISA as specified in ¶ 20 of this Complaint and therefore each member of the Board is a fiduciary for the reasons stated in ¶ 20.

39.     In addition, each member of the Board carried out the Board's role as a fiduciary with respect to the Plan as set forth in ¶ 20, engaged in the conduct and had the powers and duties alleged in ¶ 20, and was, therefore, a fiduciary for the reasons set forth in ¶ 20.

40.     The individuals who served on the Board and acted as fiduciaries with respect to the Plans during the Class Period are as follows:  Defendants O'Neal, Codina, Colbert, Conway, Bribiore, Finnegan, Jonas, Newbigging, Peters, Prueher, Reese, Rossotti and Christ (collectively, the "Board Defendants").

41.     ***The Investment Committee Defendants***.  During the Class Period each member of the Investment Committee carried out the Investment Committee's role as a fiduciary with respect to the Plans as set forth in ¶ 21, engaged in the conduct and had the powers and duties alleged in ¶ 21 and was therefore a fiduciary for the reasons set forth in ¶ 21.

42.     The individuals who served on the Investment Committee and acted as fiduciaries with respect to the Plans during the Class Period are as follows:  Defendant DiMaria (collectively, the "Investment Committee Defendants")

43.     Plaintiff does not currently know the identity of all the Investment Committee Defendants during the Class Period.  Therefore, the members of the Investment Committee Defendants are named fictitiously, as Defendants Does 1 to 10. Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

44.     ***The Administrative Committee Defendants***.  During the Class Period each member of the Administrative Committee carried out the Administrative Committee's role as a

fiduciary with respect to the Plans as set forth in ¶ 22, engaged in the conduct and had the power and duties alleged in ¶ 22, and was therefore a fiduciary for the reasons set forth in ¶ 22.

45.    Defendant DiMaria served on the Administrative Committee and acted as a fiduciary with respect to the Plans during the Class Period.

46.    Plaintiff does not currently know the identity of all the members of the Administrative Committee during the Class Period.  Therefore, the members of the Administrative Committee Defendants are named fictitiously, as Defendants Does 11 to 20. Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

47.    The Investment Committee Defendants and the Administrative Committee Defendants are collectively referred to herein as the "Committee Defendants."  The Investment Committee and the Administrative Committee are collectively referred to herein as the "Committee."

## NATURE OF THE PLANS

### The 401(k) Plan

48.    The 401(k) Plan is a defined contribution 401(k) plan that commenced activities on October 1, 1987, and covers eligible employees of Merrill Lynch and its subsidiaries. The purpose of the 401(k) Plan is to encourage employees to save for retirement. An eligible employee who is employed by the Company may elect to make salary deferral 401(k) Plan contributions upon commencement of his or her employment.

49.    Each participant in the 401(k) Plan may elect to make contributions to the 401(k) Plan on a pre-tax basis through payroll deductions from 1% through 25% of such participant's eligible compensation (as defined in the Plan document) for each pay period up to an annual maximum of $15,000 for 2006. In addition, participants who are age 50 or older and have made

the maximum contribution to the Plan, can make an additional catch-up contribution to the Plan through payroll deductions from 1% to 25% of eligible compensation to an annual maximum of $5,000. A participant can elect to change the rate at which his/her contribution is determined at any time during the year. Beginning January 1, 2005, employees may elect to contribute up to 25% of eligible compensation in after-tax dollars up to an annual maximum of $10,000.

50.     Prior to January 1, 2007, the Company matches one-half of the first 6% of eligible compensation that the employee contributes, up to an annual maximum Company contribution of $2,000, after one year of service.  Effective January 1, 2007, the Company matches 100% of the first 4% of each participant's eligible compensation contributed to the Plan, up to a maximum of $3,000 annually for employees with eligible compensation of less than $300,000, after one year of service.  For employees with eligible compensation equal to or greater than $300,000 the maximum annual Company contribution remains $2,000.

51.     Individual notional accounts are maintained for each 401(k) Plan participant. Each participant's notional account is credited with employee contributions, Company matching contributions and investment earnings, and charged with the allocation of investment losses.

52.     Participants are always 100% vested in contributions to the 401(k) Plan made from their eligible compensation and in amounts rolled over from a former employer's qualified retirement plan or transfer from another plan, and in each case, the earnings thereon.  Participants become vested in Company contributions and earnings thereon based on completed Years of Service: 1 Year of Service – 20% vested; 2 Years of Service – 40% vested; 3 Years of Service – 60% vested; 4 Years of Service – 80% vested; and 5 Years of Service – 100% vested. Participants become 100% vested in Company contributions when they attain age 65 or

terminate employment as a result of death. Participants are 100% vested in the dividends paid on Company common stock held in their notional account regardless of their years of service.

53.    The 401(k) Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k). While the 401(k) Plan is not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the 401(k) Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

54.    An employee benefit plan, such as the 401(k) Plan, must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). ERISA requires that every participant in an employee benefit plan be given a Summary Plan Description.

55.    The assets of an employee benefit 401(k) Plan must be held "in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the 401(k) Plan were held in trust by Merrill Lynch Trust Company, FSB.

56.    ERISA and the Internal Revenue Code require that plans file an Annual Report, Form 5500, with the Department of Labor and the Department of the Treasury. The 401(k) Plan filed a Form 5500 in October 2006 that was signed by Defendant DiMaria.

57.    As of December 31, 2006, the 401(k) Plan held Merrill Lynch Stock with a fair market value of approximately $1.5 billion. Merrill Lynch Stock represented approximately 27% of the total invested assets of the 401(k) Plan. As of December 31, 2005, the 401(k) Plan held shares of Merrill Lynch Stock with a fair market value of $1.24 billion. This immense holding represented approximately 27% of the total invested assets of the 401(k) Plan.

**The ESOP**

58.     In January 1989, the Company adopted the ESOP, which is a qualified retirement

plan as defined by the Internal Revenue Code. The ESOP is for the benefit of employees with a

minimum of one year of service.  A notional retirement account is maintained for each

participant.

59.     Under the ESOP, all retirement savings are invested in Merrill Lynch common

stock, until employees have five years of service, after which they have the ability to diversify.

60.     Merrill Lynch guarantees the debt of the ESOP. The note bears an interest rate of

6.75%, has an outstanding balance of $1 million as of December 29, 2006, and matures on

December 31, 2007. All dividends received by the ESOP on unallocated ESOP shares are used to

pay down the note.

61.     Merrill Lynch allocates ESOP shares of Merrill Lynch stock to all participants of

the ESOP as principal from the ESOP loan is repaid. ESOP shares are considered to be either

allocated (contributed to participants' accounts), committed (scheduled to be contributed at a

specified future date but not yet released), or unallocated (not committed or allocated).

62.     ERISA and the Internal Revenue Code require that plans file an Annual Report,

Form 5500, with the Department of Labor and the Department of the Treasury.  The ESOP filed

a Form 5500 in October 2006 that was signed by Defendant DiMaria.  According to the October

2006 Form 5500, the ESOP held $1.76 billion worth of Merrill Lynch Stock, representing

approximately 99.9% of the ESOP's invested assets.

63.     Upon information and belief, Merrill Lynch Stock represented a significant

portion of the total invested assets of the ESOP throughout the Class Period.

**The RAP**

64.    In January 1989, the Company adopted the RAP, which is a qualified retirement plan as defined by the Internal Revenue Code. The RAP is for the benefit of employees with a minimum of one year of service. A notional retirement account is maintained for each participant.

65.    The RAP contributions are employer-funded based on compensation and years of service. Merrill Lynch made a contribution of approximately $165 million to the Retirement Program in order to satisfy the 2006 contribution requirement. Under the RAP, employees are given the opportunity to invest their retirement savings in a number of different investment alternatives including Merrill Lynch common stock.

66.    The RAP filed a Form 5500 in October 2006 that was signed by Defendant DiMaria. According to the October 2006 Form 5500, the RAP held approximately $948 million worth of Merrill Lynch Stock, representing approximately 40% of the RAP's invested assets.

67.    Upon information and belief, Merrill Lynch Stock represented a significant portion of the total invested assets of the RAP throughout the Class Period.

## CLASS ACTION ALLEGATIONS

68.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a class consisting of all current and former participants (and beneficiaries thereof) of the Plans, whose individual accounts included investments in Merrill Lynch Stock during the Class Period of January 18, 2007, through the present. Excluded from the Class are Defendants, members of the Defendants' immediate families, any officer, director, or partner of any Defendant, any entity in which a Defendant has a controlling interest, and the heirs, successors, or assigns of any of the foregoing.

69.    This action is properly maintainable as a class action because:

70.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown by Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum, thousands of members of the Class.

71.     Plaintiff's claims are typical of those of the Class because Plaintiff, members of the Class and the Plans suffered similar harm and damages as a result of Defendants' systematic unlawful conduct described herein. Absent a class action, the Plans and/or members of the Class may not receive restitution or other appropriate relief, will continue to suffer losses, and these violations of law will proceed without remedy.

72.     Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and have retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class they seek to represent.

73.     A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class, which would then establish incompatible standards of conduct for Defendants. As the damages suffered by the individual Class members, direct or indirect through their participation in the Plans may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them and/or the Plan. The likelihood of individual Class members prosecuting separate claims is remote. Furthermore, Defendants' conduct affected and affects all Class members in a similar manner, making declaratory and injunctive relief to the Class as a whole appropriate.

74.    The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class.  The questions of law and fact that are common to Plaintiff and the Class include, among others:

(a)    Whether ERISA applies to the claims at issue;

(b)    Whether Defendants owe and owed fiduciary duties to the members of the Class;

(c)    The nature of the fiduciary duties Defendants owe or owed to members of the Class;

(d)    Whether Defendants breached their fiduciary duties; and

(e)    The extent of losses sustained by the Plans, and thereby members of the Class, and the appropriate measure of relief.

75.    Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

## DEFENDANTS' FIDUCIARY STATUS

76.    During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plans and/or management or disposition of the Plans' assets.

77.    During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

78.    **Named Fiduciaries**.  ERISA requires every plan to provide for one or more named fiduciaries of the Plans pursuant to ERISA § 402(a)(1)-(2), 29 U.S.C. § 1102(a)(1) and (2).  Upon information and belief, the Committee Defendants are Named Fiduciaries under the Plans.  In addition, the Merrill Lynch Defendants are Named Fiduciaries since they were appointed the Plans' Administrator.

79.    **De Facto Fiduciaries**. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., perform fiduciary functions (including a juridical person such as Merrill Lynch). ERISA § 3(2 E)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . . has any discretionary authority or discretionary responsibility in the administration of such plan." During the Class Period, all of the Defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA, by, among other things, the conduct alleged in ¶¶ 131-145.

## DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

80.    ERISA is a comprehensive statute covering virtually all aspects of an employee benefit plan, including retirement savings plans, such as the Plans. The goal of ERISA is to protect the interests of the Plans' participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect interstate commerce and the interests of participants in employee benefit Plan and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit Plan, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

81.    Under ERISA, those responsible for employee benefit plan management stand in a fiduciary relationship to plan participants. Pursuant to ERISA, a "fiduciary" is defined broadly to include all persons or entities that are able to exercise discretionary authority over the management of a plan or the payment of benefits. 29 U.S.C. § 1002(21)(A). ERISA requires strict fidelity and loyalty in the execution of the plan's management.

82.    ERISA imposes on Defendants, who are responsible for the Plans, the requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man [or woman] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

83.    ERISA also imposes on Defendants responsible for the Plans a duty of loyalty, requiring these Defendants to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of . . . providing benefits to the participants and their beneficiaries." ERISA § 404 (a)(1)(A)(i), 29 U.S.C. § 1104(a)(l)(A)(i).

84.    Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plans or disposition of Plans' assets, include but are not limited to:

    (a)    The duty to investigate and evaluate the merits of decisions affecting the use and disposition of Plans' assets;

    (b)    The duty to evaluate all investment decisions with "an eye single" to the interests of Plans' participants and beneficiaries;

    (c)    The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to participants demanded of them as plan fiduciaries and, if they find themselves in such a position, to seek independent, unconflicted advice;

(d)    To the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named, which includes, among other things: 1) the duty to ensure that the appointed fiduciary possesses the needed credentials to fulfill his or her duties, 2) the duty to make sure that the appointed fiduciary has adequate knowledge to fulfill his or her duties,  3) the duty to insure that the appointed fiduciary has access to and retains impartial advisers when needed; 4) the duty to require that the appointed fiduciary report regularly to the monitoring fiduciary; and 5) the duty to remove a fiduciary if that fiduciary has breached his or her fiduciary duty or is not performing his or her fiduciary functions in accordance with ERISA;

(e)    The duty to disclose and inform the Plans' Participants of any material adverse information about the Plans that duty entails, among other things: (1) a duty not to make materially false statements or misinform the Plans' participants concerning any aspect of the Plans including its investments; (2) an affirmative duty to inform the Plans' participants about material adverse factors that were affecting the Plans or its investments at any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; and (3) when a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to plan participants material information that the fiduciary knows or should know is sufficient to appraise the average plan participant of the comparative risks associated with investing in any particular investment;

(f)    A duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations

and in most instances at a price that renders it improbable that the investments will bring a fair return commensurate with the prevailing rates;

      (g)    A duty to diversify the Plans' investments to minimize the risk of large losses to the Plans and its participants; and

      (h)    The duty to not blindly follow plan documents if doing so leads to an imprudent result. A fiduciary may not avoid fiduciary responsibility by relying solely on the language of plan documents.

85.    ERISA permits the fiduciary function to be shared among various individuals and entities. Given ERISA's functional concept of a fiduciary, absent formal discovery it is impossible to know the full extent of which fiduciaries exercised which fiduciary functions.

86.    Insofar as the Plans were not properly diversified funds and therefore more risky to the Plans' participants, the Defendants had heightened fiduciary duties to the Plans' participants with respect to the Plans' investment in Merrill Lynch Stock, including heightened duties to disclose all material information relevant to investments in Merrill Lynch Stock.

87.    A fiduciary is liable not only for the fiduciary's own breach, but is also liable as a co-fiduciary if:

      (a)    the fiduciary participates knowingly in, or knowingly undertakes to conceal, an act or omission of another fiduciary, knowing such act or omission is a breach; or

      (b)    if, by the fiduciary's failure to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104 (a)(1) in the administration of his specific responsibilities that gives rise to fiduciary status, the fiduciary enables another fiduciary to commit a breach; or

(c)    the fiduciary knew or should have known of a breach by such other

fiduciary and does not make reasonable efforts under the circumstances to remedy the

breach.

## MERRILL LYNCH STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLANS

### Background of the Subprime Lending Industry

88.    Subprime lending is the practice of making mortgage loans to persons who are

generally unable to access credit from traditional financial institutions because they do not

satisfy credit, documentations or other underwriting standards mandated by these traditional

mortgage lenders and loan buyers, which typically lend only to more credit-worthy borrowers.

89.    Because subprime borrowers are seen as "higher risk," their loans carry interest

rates that are at least 2 percentage points higher than those offered to borrowers with better

credit.  So, for example, while a credit-worthy borrower could get a mortgage at 5% interest, the

same mortgage would cost a subprime customer 7% interest or more.

90.    The subprime market has grown rapidly in recent years.  In 1994, fewer than 5%

of mortgage originations in the United States were subprime, but by 2005 about 20% of

mortgage originations were subprime.  The greater access to subprime mortgages has helped

homeownership grow.

91.    Subprime mortgages totaled $600 billion last year, accounting for about one-fifth

of the U.S. home loan market.  An estimate of $1.3 trillion in subprime mortgages are currently

outstanding.

92.    The rapid growth of the subprime lending industry has been attributed to a

number of factors that occurred in 2004 and 2005.  These factors include rising home prices,

declining affordability, historically low interest rates, intense lender competition, innovations in

the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.

93.    The mortgage market was further fueled by significant mortgage-backed securities liquidity, with investors increasingly seeking yield through higher risk. Securitizations allow financial institutions to access the capital markets to fund mortgage operations, while simultaneously transferring credit risk away from the institutions and to securitization investors. The share of U.S. mortgage debt held outside the government-sponsored enterprises by private mortgage-backed securitizations doubled between 2003 and 2005, helping to fuel the growth of subprime and nontraditional mortgages.

94.    From 2001 to mid-2004, prime borrowers with a preference for fixed-rate mortgages refinanced in record numbers as long-term interest rates fell to the lowest rates in a generation. As interest rates began to rise in 2004 and the pool of potential prime borrowers looking to refinance shrank, lenders struggled to maintain or grow market share in a declining origination environment, and did so by extending loans to subprime borrowers with troubled credit histories.

95.    Lenders accommodated these borrowers by diversifying mortgage offerings as they competed to attract borrowers and meet prospective homebuyers' financing needs. Because of the affordability aspect already noted, borrowers increasingly turned to products such as payment option and interest-only (IO) loan structures in 2004 and 2005. These "nontraditional" mortgages are specifically designed to minimize initial mortgage payments by eliminating or relaxing the requirement to repay principal during the early years of the loan.  Payment option and interest-only loans appear to have made up as much as 40 to 50% of all subprime and Alt-A loans securitized by private issuers of mortgage-backed securities during 2004 and 2005, up from

10% in 2003. The majority of subprime originations over the past several years were "2/28 and 3/27" hybrid loan structures. These hybrid loans provide an initial fixed-rate period of two or three years, after which the loan converts to an adjustable rate mortgage ("ARM") and the interest rate adjusts to the designated loan index rate for the remaining 28 or 27 years of the loan. The 2/28 and 3/27 loan products accounted for almost three-quarters of subprime securitized mortgages in 2004 and 2005.

96.     Subprime lenders also eased lending standards to take advantage of these borrowers, including limited or no verification of borrower income and high loan-to-value transactions.

97.     In late 2004 and early 2005, there was a growing sense of concern regarding the subprime industry, and in particular the eased lending standards. To address those concerns, the Federal Reserve and other banking agencies issued guidance on subprime lending. The Interagency Guidance on Nontraditional Mortgage Product Risks highlights sound underwriting procedures, portfolio risk management, and consumer protection practices that institutions should follow to prudently originate and manage nontraditional mortgage loans. A major aspect of this guidance is the recommendation that a lender's analysis of repayment capacity should include an evaluation of the borrower's ability to repay debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule. The guidance also reminds institutions that they should clearly communicate the risks and features of these products to consumers in a timely manner, before consumers have applied for a loan.

98.     In 2006, mortgage interest rates hit four-year highs, the volume of home sales declined and the rate of home price appreciation decelerated and in some cases home prices fell, leaving the most recent subprime borrowers vulnerable to payment difficulties. Subprime

borrowers with ARMs experienced a large increase in delinquency and foreclosure rates, while prime borrowers experienced almost no increase in delinquencies and foreclosures. Borrowers were not able to avoid sharp payment increases as they could in earlier years. Even borrowers with enough equity to refinance their ARMs faced difficulty finding a loan with affordable payments, as interest rates edged higher than in earlier years.

99.    Moreover, an unusually large number of subprime loans defaulted shortly after origination. In many of these "early payment defaults," borrowers stopped making payments before they faced payment shocks, suggesting that in 2006 some lenders may have lowered their underwriting standards in the face of reduced borrower demand for credit. Because of the rapid expansion of subprime lending in recent years, lenders, investors, and ratings agencies had limited data with which to model credit risk posed by new borrowers or novel mortgage types, and so may have underestimated the risk involved. Several lenders have already been forced out of the subprime market, in part because of the wave of early payment defaults on mortgages they originated.

100.    Instead of holding mortgage loans generally, lenders sell subprime mortgages that are bundled into bonds and offer them to individual and institutional investors. Merrill Lynch became interested in subprime mortgage lenders because they helped to substantially increase the pipeline of mortgage-backed securities. *See, e.g.,* Vikas Bajaj & Christine Haughney, *Tremors at the Door*, N.Y. TIMES, Jan. 6, 2007, at C1.

101.    In 2006, approximately 80,000 subprime borrowers who took out mortgages that were packaged into securities fell into delinquency, and during the first half of 2007 dozens of lenders participating in the subprime mortgage business ceased operating as defaults and delinquencies on recent loans skyrocketed.

**Merrill Lynch's Involvement in the Subprime Market**

102.    A collateralized debt obligation ("CDO") is an investment-grade security backed by a pool of bonds, loans, and other assets. Merrill Lynch was, and to this day continues to be, heavily invested in the subprime mortgage market, CDOs and other mortgage-backed securities. In fact, Merrill Lynch has been Wall Street's largest underwriter of CDOs since 2004 through its commitment to investing in the subprime mortgage industry.

103.    Merrill Lynch and other banks typically did not operate CDOs but instead functioned as middlemen in helping clients create CDOs, taking a fee, and then exiting the deal. However, Merrill Lynch ran into trouble when it became a huge investor in the funds that it assisted. In 1997, Defendant O'Neal became the co-head of the institutional business and it was then that things began to change: "Mr. O'Neal pushed to expand Merrill's role in new kinds of bonds and other financial instruments, which helped propel profits in recent years before leading to trouble." *See* Randall Smith & Jed Horowitz, *O'Neal Faces Grilling As Losses Far Exceed Projections Made Oct. 5*, WALL ST. J., Oct. 25, 2007, at A1.

104.    In 2005, Merrill Lynch's underwriting total was $35 billion, $14 billion of which was backed primarily by securities that were tied to subprime mortgages. By 2006 Merrill Lynch's underwriting of CDOs rose to $44 billion and continued to increase throughout 2007 despite warning signs of the deleterious effects of investing in the subprime mortgage market.

105.    While many investment banks scaled back exposure to CDOs in the wake of the collapse of the subprime mortgage market, Merrill Lynch inexplicably continued to expand its CDO business under the leadership of CEO Defendant O'Neal:

> Merrill rose from a bit player in mortgage CDOs in 2003, with just
> $3.4 billion in underwritings, to the leader from 2004 through
> 2006, posting $44 billion in deals backed by mortgages last year.
> O'Neal primed the pump by purchasing First Franklin, one of the
> nation's largest originators of subprime mortgages, in December
> 2006 for $1.3 billion. In early 2007 one unit at Merrill was busy

packaging First Franklin's loans into subprime ABS that another Merrill unit bought for the CDOs. Incredibly, in the first half of 2007, Merrill underwrote $28 billion in mortgage CDO bonds, far exceeding its pace for 2006.

*See* Shawn Tully, *Wall Street's Money Machine Breaks Down*, Fortune Magazine, Nov. 26, 2007, at 64.

106.    When the subprime mortgage market began to collapse, Merrill Lynch was stuck with billions of dollars of debt that it could not resell: "Merrill's $41 billion exposure to subprime paper was more than its entire shareholders' equity of $38 billion. That this huge position went unhedged astonishes everyone on Wall Street. The $7.9 billion write-down meant that Merrill lost 19% on its bonds." *Id.*

107.    Prior to the drastic downturn in the subprime mortgage market Merrill Lynch was able to sell the bulk of the CDOs that it underwrote, but beginning in 2005 investors were skittish about these investments in light of the slowing housing industry. However, "For Merrill, the fees it earned from arranging these deals were too lucrative to give up. . . . Traditionally these top-rated securities were insured by a financial guaranty company, which effectively bore the risk of losses. But by mid-2006, few bond insurers were willing to write protection on CDOs that were ultimately backed by subprime mortgages to people with poor credit histories." *See* Randall Smith & Jed Horowitz, *O'Neal Faces Grilling As Losses Far Exceed Projections Made Oct. 5*, WALL ST. J., Oct. 25, 2007, at A1.

108.    Merrill Lynch's heavy involvement in the CDO market defied all economic logic. Nevertheless, despite the fact that Defendants knew or should have known that this involvement would lead to a significant decrease in the Company's stock price once the truth became known, certain Defendants concealed the truth due to their own financial incentives, thereby artificially

inflating the Company's stock price while ensuring that write-downs for subprime losses were kept artificially low.

<u>During the Class Period Merrill Lynch Disseminated Materially Inaccurate, Incomplete and Misleading Information to the Plans' Participants</u>

109.    The false and misleading statements disseminated to the Plans' participants in, among other things, company filings and press releases, prevented the Plans' Participants, as well as the market, from being able to realistically assess Merrill Lynch's financial well-being and performance, resulting in the artificial inflation of the Company's stock price.

110.    Despite the downward trend in the credit industry in general and in the subprime mortgage industry specifically, Merrill Lynch assured the market and the Plans' Participants that the Company would not fall victim to these negative trends.

111.    For example, in its 2006 Form 10-K filed with the SEC on February 26, 2007 ("2006 10-K"), the Company boasted about its acquisition of National City First Mortgage Franklin Financial Corp. ("First Franklin"). First Franklin was a large originator of subprime mortgage loans. Thus, rather than back away from further investment in the subprime industry, as other investment firms had begun doing, Merrill Lynch lauded this acquisition as a strategic transaction that would provide additional sources of origination and servicing for its subprime mortgage-backed securitization and trading platform.

112.    The Company also continued to portray a strong financial image via its financial results for the First Quarter of 2007. On April 19, 2007, it reported net revenues up 24% from the prior year, and up 14% for the fourth quarter of 2006, its second highest quarterly revenue in history. Defendant O'Neal stated that "This was a terrific quarter. In an environment which was volatile at times, we took full advantage of market opportunities and delivered value to our clients and shareholders."

113.    In a July 2007 Press Release, Defendant O'Neal touted Merrill Lynch's good financial results for the second quarter of 2007, stating that "We delivered another strong quarter in a volatile and, sometimes, hostile environment." The Company further boasted of its "strong performance despite uneven market conditions."

114.    By the fall of 2007 the stock prices of many large lenders fell significantly as a result of problems stemming from the subprime mortgage industry, namely the fact that many subprime mortgage-based securities had become virtually worthless. "As problems in the subprime mortgage market became more apparent over the summer, investors shunned these products and also became unwilling to purchase products that could have any exposure to housing-related and other structured products more generally." *See* Greg Morcroft, *Merrill Swings To Loss On Huge Mortgage Hit*, MarketWatch, Oct. 24, 2007, http://www.marketwatch.com. But despite the Plans' heavy investment in Company Stock, Merrill Lynch continued to conceal the truth regarding the serious danger to its financial health resulting from the subprime crisis.

**Merrill Lynch Acknowledges Its Subprime Market Exposure**

115.    On October 5, 2007, Merrill Lynch issued a press release in which it began to acknowledge that the credit-market meltdown indeed had a severe effect on its business and operations. It announced write-downs of $4.5 billion "related to incremental third quarter market impact on the value of CDOs and subprime mortgages." In addition, contrary to the market's expected increase of as much as $2.00 per share, it expected to lose as much as $0.50 per share.

116.    On October 16, 2007, business news channel CNBC reported that Jeff Edwards, Merrill Lynch's chief financial officer, would be replaced soon, citing bullish comments that Edwards made on a July conference call with analysts and investors as a possible reason for the move.

117.    On October 24, 2007, Merrill Lynch shocked the market when it posted a $2.24 billion loss as a larger-than-expected $8.4 billion write-down on mortgage-related securities left the firm with its first quarterly deficit since 2001. This loss was nearly six times the loss that the Company had predicted on October 5, only three weeks earlier.

118.    Merrill Lynch further announced that net revenues for the first nine months of 2007 were down 23% from the comparable 2006 period and that net earnings were down 61%.

119.    In a conference call, O'Neal explained this by stating that "It turned out our assessment of the potential risk and mitigation strategies were inadequate."

120.    With this news, shares of Merrill Lynch stock fell from $67.12 per share to as low as $61.40 per share, amid trading volume of 52 million shares.

121.    Also upon this news, shares of Merrill Lynch were downgraded. For example, Standard & Poor's called the loss "staggering," stating that "The absolute size of the loss related to CDOs and subprime mortgages, and management's miscues regarding valuation of its positions, further heighten our concerns regarding the company's risk-management practices business strategy." *See* Greg Morcroft, *Merrill Swings To Loss On Huge Mortgage Hit*, MarketWatch, Oct. 24, 2007, http://www.marketwatch.com.

122.    On October 28, 2007, reports emerged that O'Neal was being forced out of Merrill Lynch. Analysts' reaction to this news ranged from expectation of further write-downs to a possibility that the company might become an acquisition target.

123.    Defendant O'Neal was ousted by Merrill Lynch on October 30, 2007, after Merrill Lynch had lost over $2 billion in the third quarter.

124.    Upon information and belief, Merrill Lynch continues to delay recording losses based on mortgage-backed securities using the help of hedge funds. According to a Wall Street

Journal article: "In one deal, a hedge fund bought $1 billion in commercial paper issued by a Merrill-related entity containing mortgages . . . . In exchange, the hedge fund had the right to sell back the commercial paper to Merrill itself after one year for a guaranteed minimum return." *See* Susan Pulliam, *Deals With Hedge Funds May Be Helping Merrill Delay Mortgage Losses*, WALL ST. J., Nov. 2, 2007, at A1.

125.    Through these off-balance-sheet transactions, Merrill Lynch was, and still is, able to conceal its financial problems to Plan Participants and to the market: "At issue with any hedge-fund deals is whether there was an attempt by Merrill to sweep problems under the rug through private transactions kept our of view from investors. Some previous scandals, such as the collapse of Enron Corp. and the troubles of Japan's financial system in the 1990's, involved efforts to hide problems through off-balance sheet transactions." *Id.*

126.    In response to this report, a Merrill Lynch spokeswoman merely said, "We don't comment on specific transactions and we are confident in the appropriateness of our marks." *Id.*

127.    On November 2, 2007, the SEC announced that it was investigating Merrill Lynch regarding matters related to its subprime mortgage holdings.

128.    More bad news for the Company was to follow. On December 5, 2007, The Wall Street Journal reported that New York State Attorney General Andrew Cuomo sent Merrill Lynch a broadly written subpoena aimed at seeking information related to the packaging and selling of mortgage-related debt. When asked to comment, a Merrill Lynch spokesman declined, stating "we always cooperate with regulators when asked to do so." Kara Scannell, *Credit Crunch: Wall Street Firms Are Subpoenaed--New York Examines Treatment of Debt Tied to Risky Mortgages*, WALL ST. J., Dec. 5, 2007, at C2.

129.    Analysts expect additional write-downs on collateralized debt obligations, with estimates of $5 billion to $10 billion. Deutsche Bank analyst Mike Mayo said, "we have increasingly lost confidence in the financials of Merrill, especially after the sudden increase in write downs."130.    Analysts also predict further losses for Merrill Lynch for the fourth quarter. On December 26, 2007, Bloomberg News reported that CIBC World Markets Corp. analyst Meredith Whitney increased her fourth-quarter loss forecast for Merrill Lynch due to increased write-downs. "Whitney now expects a loss of $2.70 per share, up from 50 cents per share. Whitney expects Merrill Lynch to take a writedown of up to $7 billion because of bad bets on the mortgage industry." Christine Harper, *Merrill's Writedowns Top $8 Billion, Analysts Say (Update 2)*, Bloomberg, Dec. 20, 2007, http://www.bloomberg.com.

## CONDUCT CONSTITUTING DEFENDANTS' FIDUCIARY BREACHES

130.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plans. The Defendants breached their duties to prudently and loyally manage the Plans' assets because, during the Class Period, Defendants knew or should have known that Company Stock was not a prudent investment for the Plans and knew or should have known that the value of Company Stock was exposed to an unacceptable risk of loss.

131.    Defendants' knowledge that the Company Stock was an imprudent investment is based on the fact that Defendants knew or should have known of the unsound business practices and risky lending activities and other misrepresentations alleged herein. Defendants failed to take adequate steps to prevent the Plans, and indirectly the participants, from suffering losses as a result of the Plans' investments in Company Stock.

132.    Upon information and belief, not one of the Defendants conducted an appropriate investigation into whether Company Stock was a prudent investment for the Plans in light of the Company's unsound business practices, risky lending activities and other related serious

corporate misconduct, and given the fact that the Plans held enormous investments in Company Stock. Moreover, not one of the Defendants provided the Plans' participants with information regarding the true nature of these business practices and the extraordinary risks that they presented to Merrill Lynch, such that the Plans' participants could make informed decisions regarding the Company Stock in the Plans. Indeed, not one of the Defendants took any meaningful action to protect the Plans against the risk of enormous losses as a result of the Company's very risky and inappropriate corporate misconduct.

133.    On a Class-wide and Plan-wide basis the risk of an undiversified investment in Company Stock imposes a greater risk than that of other undiversified investments.

134.    The risk associated with the investment in Company Stock during this time of unsound business practices was an extraordinary risk, far above and beyond the normal, acceptable risk associated with investment in company stock. This abnormal investment risk could not have been known by the Plans' participants, and the Defendants knew or should have known that it was not known by them because the Defendant fiduciaries never disclosed it. This extraordinary risk made any investment in Company stock inappropriate and imprudent.

135.    Participants, even before placing any retirement savings in Company Stock, relied on the stability and financial viability of Merrill Lynch as the basis for their standard of living. The participants' salaries, healthcare and other benefits, as well as the participants' pension (if any) and retirement health insurance depended upon Merrill Lynch's continued solvency and viability.

136.    Thus, one of the risks that could impair the participant's investment in Company Stock – the failure or insolvency of the employer – would also cause the loss of current income and benefits and future non-Plan related retirement benefits. The risks are correlated and, if

realized, would financially devastate most employees and participants in the Plans. Therefore, the Defendants had a heightened duty with regard to both the decision to continue investing in Company Stock as well as the duty to inform participants concerning the imprudence of investing in Company Stock.

137.    Defendants breached their fiduciary duties when they failed to conduct an appropriate investigation into whether Merrill Lynch Stock was a prudent investment for the Plans; failed to develop appropriate investment guidelines for Merrill Lynch Stock; failed to divest the Plans of Merrill Lynch Stock; failed to discontinue further contributions of Merrill Lynch Stock to the Plans; failed to remove Merrill Lynch Stock as an investment option for the Plans; failed to either consult or appoint independent fiduciaries regarding the appropriateness of an investment in Merrill Lynch Stock; and failed to resign as fiduciaries of the Plans, if as a result of their employment by Merrill Lynch, they could not loyally serve the Plans and their participants. In addition, these Defendants breached their fiduciary duties when they failed to prohibit any participant from making an "investment switch" into Merrill Lynch Stock. In fact, the Defendants continued to invest and to allow investment of the Plans' assets in Company Stock even though they knew or should have known that Merrill Lynch would be taking millions of dollars in losses to earnings to remedy its risky lending practices, resulting in a decrease in the value of Merrill Lynch Stock. No other Defendant fiduciary took any action to remedy the breaches set forth in this paragraph.

138.    The Defendants breached their fiduciary duties by direct and indirect communications with the Plans' participants, made in their fiduciary capacity, which contained statements concerning Company Stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative

and materially misleading statements as to Merrill Lynch's lending practices, Merrill Lynch's earnings, and Merrill Lynch's profitability as detailed in this Complaint, that were contained in the following documents that, upon information and belief, were specifically incorporated into the SPD:  SEC S-8 statements, SEC Form 10-K annual reports and interim periodic reports, Merrill Lynch's Annual Report, and the Plans' annual reports on SEC Form 11-K.  In addition, the foregoing documents omitted, and continue to omit, material information concerning Merrill Lynch's financial performance, including Merrill Lynch's exposure to subprime mortgage-based securities.  No Defendant took any action to remedy the breaches set forth in this paragraph.

139.    Moreover, Defendants knew or recklessly disregarded certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) and ESOP industry and trade press:

(a)    Out of loyalty, employees tend to invest in company stock;

(b)    Employees tend not to change their investment option allocations in the plan once made;

(c)    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

(d)    Many employees do not recognize their exposure to massive loss from failing to diversify their investment.

140.    As a result of Defendants' knowledge of and implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Merrill Lynch Stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company Stock.

141.    Based on their actual or constructive knowledge as set forth in ¶¶ 88-129,
Defendants knew about Merrill Lynch's risky exposure to the subprime credit market.
Defendants knew or should have known of the affirmative misrepresentations made to
Participants in the SEC documents and annual reports incorporated into the SPD.  Defendants
knew that the Plans' participants lacked the knowledge that Defendants had or should have had
concerning the unsound business practices and knew or should have known that the Plans'
participants would be harmed by this lack of knowledge.  Defendants, on a Plan-wide and Class-
wide basis, never accurately disclosed to Plaintiff or the Plans' participants the true nature,
extent, and risks of these problems.  Rather, Defendants failed to timely communicate accurate
information to the Plans' participants concerning Merrill Lynch's true financial condition,
including its risky exposure to the subprime credit market in prior periods, when they knew or
should have known that the Plans' participants needed this information.  Defendants and/or their
individual fiduciary delegates, on a Class-wide and Plan-wide basis, failed to provide the Plans'
participants with complete and accurate information regarding Merrill Lynch Stock, such that the
participants could appreciate the true risks presented by investments in Merrill Lynch Stock and
could make informed decisions, thereby avoiding the unreasonable and entirely predictable
losses incurred as a result of the Plans' investment in Merrill Lynch Stock.  No Defendant took
any action to remedy the breaches set forth in this paragraph.

142.    The Merrill Lynch Defendants and Board Defendants failed in their fiduciary
responsibilities in monitoring the Committee Defendants.  The Merrill Lynch Defendants and
Board Defendants breached their fiduciary duties because they did not have procedures in place
so that they could review and evaluate on an ongoing basis whether the Committee Defendants
were performing their duties adequately and in accordance with ERISA's fiduciary provisions.

The Merrill Lynch Defendants and Board Defendants breached their fiduciary duty to remove the Committee Defendants when they knew the Committee Defendants had breached their fiduciary duties. The Merrill Lynch Defendants and Board Defendants failed to adequately review the performance of the Committee Defendants to: ensure that they were fulfilling their fiduciary duties under the Plans and ERISA; ensure that they had adequate information to do their job of overseeing the Plans' investments; ensure that they had adequate access to and use of impartial advisors when needed; and ensure that they reported regularly to the Board.

## DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST

143.    Merrill Lynch's SEC filings make clear that a significant percentage of Merrill Lynch's officer and director compensation is in the form of stock grants or stock option grants.

144.    Because the compensation of many of the Defendants was significantly tied to the price of Merrill Lynch Stock, Defendants had an incentive to keep the Plans' assets heavily invested in Merrill Lynch Stock on a regular, ongoing basis. Elimination of Company Stock as an investment option would have reduced the overall market demand for Merrill Lynch Stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Merrill Lynch Stock, resulting in lower compensation for the Defendants.

145.    Moreover, keeping the Plans' assets heavily invested in Merrill Lynch Stock allowed Defendants to sell their personally held Merrill Lynch Stock at artificially inflated prices.

146.    This insider selling created a serious conflict of interest between Defendants' fiduciary duties and their personal interests, because Defendants were able to divest their own Company Stock when they became aware of the Company's unsound business practices and risky lending activities; they did *not*, however, divest the Plans' investment in Merrill Lynch Stock, allowing themselves to personally profit and leaving the Plans to suffer massive losses.

147.    Some Defendants may have had no choice in tying their compensation to Merrill Lynch Stock (because compensation decisions were out of their hands), but Defendants did have the choice in what information to disclose to the Participants and whether to keep the Participants' retirement savings invested in Company Stock.

148.    These conflicts of interest put the Defendants in the position of having to choose between their own interests and the interests of the Participants.

## CAUSATION

149.    The Plans suffered massive losses because a substantial amount of the Plans' assets were imprudently invested in Merrill Lynch Stock during the Class Period, and in breach of Defendants' fiduciary duties.

150.    Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning Merrill Lynch Stock and divesting the Plans from Company Stock offered by the Plans when such investment became imprudent, the Plans would have avoided losses suffered in Company Stock.

151.    As a result of Defendants' actions, Plaintiff and the Class, which invested in Merrill Lynch Stock through the Plans, were wrongfully damaged, as the Plans suffered substantial losses from Defendants' failure to fulfill their fiduciary responsibilities as described herein. Had the fiduciaries acted prudently and in accordance with their fiduciary duties, they would have taken steps to eliminate or reduce the amount of Merrill Lynch Stock held by the Plans, eliminated the option for participants to place funds in Merrill Lynch Stock, or fully disclosed the material adverse facts concerning Merrill Lynch Stock described herein. Plaintiff and the Class are entitled to the best alternative investment available to them under the circumstances, and the Plans would have achieved gains and avoided losses but for Defendants' breach of fiduciary duty as described herein.

152.    The Plans and the Plans' fiduciaries do not qualify for any affirmative defense based on ERISA Section 404(c) as the Plans did not satisfy the numerous stringent requirements of Section 404(c) and the Department of Labor Regulations promulgated thereunder, as set forth in 29 C.F.R. § 2550.404c-1. This is because Defendants, among other ERISA § 404(c) disclosure failures, failed to ensure effective participant control by providing complete and accurate material information to participants regarding Company Stock. *See* 29 C.F.R. § 2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Company Stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that result from such investment.

153.    Furthermore, under ERISA, fiduciaries - not participants - exercise control over the selection of investment options made available to participants. Thus, whether or not participants are provided with the ability to select among different investment options, and whether or not participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment option is selected by the fiduciaries and presented as an option to participants, and as a result of such action the Plans suffer a loss. Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plans and are not entitled to any protection under ERISA § 404(c).

154.    The losses suffered by the Plans and the Plans' participants and beneficiaries, including Plaintiff and the Class, were the direct and necessary result of the misconduct of Defendants alleged herein. Plaintiff and the Class were unaware, and in the exercise of

reasonable diligence could not have been aware, of the true and accurate extent of Merrill Lynch's risky and unsound business practices, as well as Defendants' continuing breaches of fiduciary duty in failing to disclose such material facts.

## REMEDIES FOR DEFENDANTS' BREACH OF THEIR FIDUCIARY DUTIES

155.    Defendants breached their fiduciary duties in that they knew or recklessly disregarded the facts as alleged above, and therefore knew or recklessly disregarded that the Plans' assets should not have been so heavily invested in Company Stock.  As a consequence of the Defendants' breaches, the Plans suffered significant losses.

156.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109.  Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan."  Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

157.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available.  In this way, the remedy restores the values of the Plans' assets to what they would have been if the plans had been properly administered.

158.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans in the amount of the losses to the Plans resulting from the breaches of fiduciary duties alleged above and to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive

and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA § 409(a) and 502(a)(2)-(3), 29 U.S.C. § 1109(a) and § 1132(a)(2)-(3); (3) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## COUNT I

**Failure to Prudently Manage the Plans' Assets;
Breach of Fiduciary Duties In Violation of ERISA § 404
(Against All Defendants)**

159.    Plaintiff incorporates the foregoing paragraphs herein by reference.

160.    The Plans are governed by the provisions of ERISA, 29 U.S.C. § 1001, *et. seq.*, and Plaintiff and the Class are participants and/or beneficiaries in the Plans. The Defendants are all fiduciaries with respect to the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). They were thereby bound by the duties of loyalty, exclusive purpose, and prudence.

161.    Defendants named in this Count were each responsible, in different ways and degrees, for the Plans' investments in Company Stock.

162.    Under ERISA, fiduciaries who exercise discretionary authority or control over the management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to plan participants are prudent. Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.

163.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

164.    Defendants named in this Count were responsible for ensuring that investment in Company Stock was prudent and consistent with the purpose of the Plans. Defendants are liable for any and all losses incurred as a result of such investments being imprudent.

165.    During the Class Period, the Defendants named in this Count knew or should have known that Company Stock was not a suitable, prudent or appropriate investment for the Plans as described herein, irrespective of any duty of diversification that may exist. Notwithstanding this knowledge, these Defendants offered and continued to offer Company Stock as investment options for the Plans and/or offered and continued to offer to direct and approve the investment in Company Stock.

166.    Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, the Defendants named in this Count failed to take any meaningful steps to prevent the Plans, and indirectly the Plans' participants and beneficiaries, from suffering losses as a result of the Plans' investments in Company Stock. The Defendants named in this Count knew or should have known that a prudent fiduciary acting under similar circumstances would have made different investment decisions with respect to the Company Stock and that continued investment in Company Stock was not in keeping with the Plans' settlors' expectation on how a prudent fiduciary would operate.

167.    The Defendants named in this Count had actual or constructive knowledge of the Company's serious mismanagement, risky exposure to the subprime credit market and other misrepresentations that impacted Company Stock as alleged in this Complaint. Despite this knowledge, they participated in each other's failures to prudently manage the Plans' assets and knowingly concealed such failures by not informing the Plans' participants that Company Stock was not a prudent investment.

168.    In addition to other breaches of fiduciary duty alleged in this Count, the Defendants committed the following fiduciary breaches: (a) failed to conduct an appropriate investigation into whether Company Stock was a prudent investment for the Plans; (b) failed to develop appropriate investment guidelines for Company Stock; (c) failed to divest the Plans of Company Stock; (d) failed to discontinue further Plan contributions to Company Stock; (e) failed to remove Company Stock as investment options of the Plans; (f) failed to either consult or appoint independent fiduciaries regarding the appropriateness of an investment in Company Stock; (g) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Company Stock an unsuitable and imprudent investment for the Plans; and (h) failed to resign as fiduciaries of the Plans if, as a result of their employment by Merrill Lynch or its affiliates, they could not loyally serve the Plans and their participants.  In addition, these Defendants, breached their fiduciary duty when they failed to prohibit any participant in the Plans from making an "investment switch" into Company Stock.

169.    As a result of the breach of fiduciary duties of the Defendants named in this Count, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

170.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants named in this Count are personally liable to restore the losses to the Plans caused by their breach of fiduciary duty as alleged in this Count.

## COUNT II

### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries; Breaches of Fiduciary Duties in Violation of ERISA § 404 (Against All Defendants)

171.    Plaintiff incorporates the foregoing paragraphs herein by reference.

172.    At all relevant times herein, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

173.    During the Class Period, Defendants knew or should have known that Company Stock was not a suitable, prudent or appropriate investment for the Plans.

174.    As alleged herein, the scope of the Defendants' fiduciary duties and responsibilities included drafting and disseminating Plan documents, SPDs and information to participants regarding the assets of the Plans.

175.    All Defendants had a duty to provide participants with information they possessed that they knew or should have known would have a material impact on the Plans.

176.    The duty of loyalty under ERISA requires the Defendants to speak truthfully to the Plans' participants, not to mislead them regarding the Plans or the Plans' assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans. The Defendants' duty of loyalty included not only the negative duty not to misinform, but also an affirmative duty to inform when the Defendants' knew or should have known that silence might be harmful. If a fiduciary knows that a material misrepresentation has been made to a Participant, that fiduciary, without regard to the functions that make that person a fiduciary, has an affirmative duty to correct that misrepresentation. Moreover, Defendants are required to provide each participant with sufficient information to make informed decisions with regard to investment alternatives available under the Plans, including Company Stock.

177.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plans' sponsor.

178.    This duty to inform participants included the Defendants' obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain from providing false information or concealing material information regarding the Plans' investment options such that participants can make informed decisions with regard to investment options available under the Plans. This duty applies to all of the Plans' investment options, including the Company Stock.

179.    Because a substantial percentage of the Plans' assets were invested in Company Stock, such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Company Stock.

180.    Because of the disparity in knowledge between Defendants and the Plans' participants, the participants relied on Defendants to provide them with accurate and complete information about Merrill Lynch, which was material to the suitability of Company Stock as a prudent investment option.

181.    The fiduciary duty to honestly communicate with participants is designed not merely to inform participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance. By failing to discharge their disclosure duties, the Defendants facilitated the illegal conduct in the first instance.

182.    The Defendants breached their fiduciary duties by direct and indirect communications with the Plans' participants, made in their fiduciary capacity, which contained statements concerning Company Stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative

and materially misleading statements as to Merrill Lynch's unsound business practices and
Merrill Lynch's risky exposure to the subprime credit market as detailed in this Complaint.

183.    The Defendants breached their fiduciary duties not only with regard to the
affirmative misrepresentations, but also because those documents omitted, and continue to omit,
material information concerning Merrill Lynch's serious mismanagement, including Merrill
Lynch's risky exposure to the subprime credit market.  In addition, the Defendants breached their
fiduciary duties by conveying inaccurate information regarding the soundness or security of
Company Stock and the prudence of investing retirement contributions in Company Stock.

184.    All Defendants breached their fiduciary duty when they failed to provide Plans
participants, on a Class-wide and Plan-wide basis, information regarding the imprudence of
investing in Company Stock.  All Defendants knew or should have known that the Plans'
participants lacked the knowledge that Defendants possessed concerning the imprudence of
investing in Company Stock; knew or should have known that the Plans' participants would be
harmed by this lack of knowledge; and knew or should have known that material
misrepresentations regarding Company Stock were made to the Plans' participants.  All
Defendants, on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiff or the
Plans' participants the true nature, extent, and risks of investing in Company Stock when they
knew or should have know that investment in Company Stock was imprudent.  Rather, all
Defendants failed to timely communicate accurate information to the Plans' participants
concerning Merrill Lynch's risky exposure to the subprime credit market during the Class Period
when they knew or should have known that the Plans' participants needed this information.

185.    As a consequence of Defendants' breaches of fiduciary duty alleged in this Count,
the Plans suffered tremendous losses.  If the Defendants had discharged their disclosure

obligations prudently and in the sole interests of the Plans' participants and beneficiaries, then

losses suffered by the Plans would have been avoided or greatly minimized.  Therefore, as a

direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and

indirectly Plaintiff and the other Class members, lost hundreds of millions, if not billions of

dollars of retirement savings.

186.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29

U.S.C. § 1109(a), the Defendants are personally liable to the Plans for these losses incurred as a

result of Defendants' misrepresentations to the Plans' participants as well as their breach of the

fiduciary duty to disclose and inform.

## COUNT III

### Failure in Appointing and Monitoring Plan Fiduciaries;
### Breaches of Fiduciary Duties in Violation of ERISA § 404
### (Against the Board Defendants)

187.    Plaintiff incorporates the foregoing paragraphs herein by reference.

188.    At all relevant times herein, Defendants were fiduciaries within the meaning of

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

189.    At all relevant times herein, the fiduciary duties of the Board Defendants included

the power and responsibility to appoint, and the duty to oversee and thereby monitor the

performance of the Committee.

190.    At all relevant times herein, the scope of the fiduciary duties of the Board

Defendants included the oversight and the power and responsibility to appoint, and thereby

monitor the performance of the Committee.

191.    During the Class Period, Defendants knew or should have known that Company

Stock was not a suitable, prudent or appropriate investment for the Plans, as described herein.

192.    Under ERISA, a fiduciary with appointment powers must ensure that the appointed fiduciaries are performing their fiduciary obligations, including those obligations with respect to handling, holding and investing plan assets; and must take prompt and effective action to protect the plans and participants when the appointed fiduciaries are not meeting their fiduciary obligations.

193.    The appointing fiduciary must have procedures in place so that they may review and evaluate on an ongoing basis whether the appointed fiduciaries are doing an adequate job (including, for example, by requiring periodic reports on their work and the plans' performance, and by ensuring that they have a prudent process for obtaining information and resources they need).  In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for (1) promptly and prudently concluding that their appointees were faithfully and effectively performing their obligations to the plans' participants; or (2) deciding whether to retain or remove their appointees.

194.    An appointing fiduciary must provide the appointed fiduciaries with all the information that they have or reasonably should have in order to prudently manage the plans and the plans' assets or that may have a material impact on the plans and the fiduciaries' investment decisions regarding the plans.

195.    The Board Defendants breached their fiduciary appointing and monitoring duties by, among other things: (1) failing to appoint persons with the requisite knowledge, skill, and expertise to properly administer the Plans and manage their assets; (2) failing to adequately monitor their appointees, evaluate their performance, or have an adequate system in place for doing so, (and standing idly by as the Plans suffered enormous losses as a result of the appointees' imprudent action); (4) failing to ensure that the appointed fiduciaries (although

possessing actual knowledge of unsound business practices and risky lending activities and other misrepresentations concerning Company Stock as alleged herein) understood the true extent of Merrill Lynch's risky exposure to the subprime credit market and its impact on the value of Company Stock and the Plans' concomitant investment in Company Stock.

196.    The Board Defendants breached their fiduciary duty by failing to remove the appointed fiduciaries, as named herein, whose performance was inadequate. The Board Defendants, knew that the appointed fiduciaries: (a) failed to conduct an appropriate investigation into whether Company Stock was a prudent investment for the Plans; (b) failed to develop appropriate investment guidelines for Company Stock; (c) failed to divest the Plans of Company Stock; (d) failed to discontinue further Plan contributions to Company Stock; (e) failed to remove Company Stock as investment options for the Plans; (f) failed to consult with or appoint independent fiduciaries regarding the appropriateness of an investment in Company Stock; (g) failed to prohibit any participant from making an "investment switch" into Company Stock; (h) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Company Stock an unsuitable or imprudent investment for the Plans; and (i) failed to inform the Plans participants that investment in Company Stock would not be prudent.

197.    As a consequence of the Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses. Had Defendants named in this Count discharged their fiduciary duties as described above, the losses suffered by the Plans would have been averted or, at a minimum, lessened. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the other Class members, lost hundreds of millions, if not billions of dollars of retirement savings.

198.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

199.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), the Board Defendants are personally liable to restore the losses to the Plans caused by their failure to monitor and remove fiduciaries as alleged in this Count.

## COUNT IV

### Co-Fiduciary Liability;
### Breaches of Fiduciary Duties in Violation of ERISA § 405
### (Against all Defendants)

200.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

201.    At all relevant times, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

202.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability that he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if: (i) he participates in, or undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (ii) he fails to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) in the administration of his specific responsibilities that give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (iii) he knew or should have known of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

203.    During the Class Period, Defendants knew that Company Stock was not a suitable, prudent or appropriate investment for the Plans as described herein.

**Failure to Remedy**

204.    ERISA § 405(a)(3), 29 U.S.C. § 1105(3) imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

205.    The Board Defendants were aware that the Committee Defendants breached their fiduciary duties as alleged in Count I of the Complaint. Despite this knowledge, the Board Defendants failed to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plans' investment in Company Stock, as well as other fiduciary breaches alleged in Count I. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the Board Defendants could have taken, included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Company Stock to the Plans' participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries actions; or (4) preparing to obtain an injunction from a Federal District Court.

206.    To the extent that it is determined that any Board Defendant and/or Committee Defendant did not breach his fiduciary duty as alleged in Count I of the Complaint, that Defendant was still aware that the remaining Defendants in Count I did, in fact, breach their fiduciary duties. Despite this knowledge, the Defendant(s) named in this paragraph breached their fiduciary duties by failing to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plans' investment in Company Stock and other fiduciary breaches alleged in Count I. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the

Defendant(s) could have taken included but are not limited to: objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board or Committee; disclosing the imprudence of the investment in Company Stock to Plan Participants; notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or preparing to obtain an injunction from a Federal District Court.

207.    To the extent that it is determined that any Defendant did not commit any of the fiduciary breaches as alleged in Count II of the Complaint, any such Defendant was still aware that the remaining Defendants named in Count II breached their fiduciary duties. Despite this knowledge, the Defendant(s) named in this paragraph breached their fiduciary duty by failing to undertake any effort to remedy the fiduciary breaches alleged in Count II, including the duty to remedy their co-fiduciaries' misrepresentations and their co-fiduciaries' breach of the affirmative duty to inform the Plans' participants regarding the imprudence of investing in Company Stock. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the Defendant(s) could have taken included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Company Stock to the Plans' Participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or (4) preparing to obtain an injunction from a Federal District Court.

**Enabling A Breach**

208.    ERISA § 405(a)(2), 29 U.S.C. § 1105(2) also imposes co-fiduciary liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities that give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

209.    To the extent that it is determined that any Board Defendant or Committee Defendant lacked knowledge of the circumstances rendering the Plans' investment in Company Stock imprudent, then all other Defendants enabled the imprudent asset management decisions of that Defendant by failing to provide that Defendant with complete and accurate information regarding the Company's risky exposure to the subprime credit market and other misrepresentations concerning Company Stock. In failing to inform their co-fiduciaries, who lacked knowledge, if any, these Defendants breached ERISA § 405(a)(2).

210.    Through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged in this Complaint, the Board Defendants enabled the Committee Defendants imprudent management of Company Stock in the Plans.

211.    Further, through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged above, the Board Defendants and Committee Defendants enabled the remaining Defendants' imprudent management of Company Stock in the Plans.

212.    The Board Defendants' failure to monitor the Committee Defendants enabled the Committee Defendants to breach their duties.

213.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

214.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), ERISA § 409, 29 U.S.C. § 1109(a), and ERISA § 405, 29 U.S.C. § 1105, Defendants are liable to restore the losses to the Plans caused by their co-fiduciary breaches of fiduciary duties alleged in this Count.

## COUNT V

### Breach of Duty to Avoid Conflicts of Interest
### (Against All Individual Defendants)

215.    Plaintiff incorporates the foregoing paragraphs herein by reference.

216.    At all relevant times, as alleged above, the Individual Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

217.    ERISA § 494(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his or her duties with respect to the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

218.    These Defendants were heavily invested in Merrill Lynch Stock and had an interest in ensuring that the Plans' assets were also heavily invested in Merrill Lynch Stock on a regular, ongoing basis. Elimination of Company Stock as an investment option for the Plans would have reduced the overall market demand for Merrill Lynch Stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Merrill Lynch Stock, resulting in losses for the Defendants named in this Count.

219.    The Defendants named in this Count placed their own interest in investing the Plans' assets in Merrill Lynch Stock over the Plans' participants' interest in maintaining diversified and prudently invested ERISA plans.

220.    The Defendants named in this Count breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia: failing to engage an independent fiduciary who could make independent judgments concerning the Plans' investment in Merrill Lynch Stock; failing to take such other steps as were necessary to ensure that participants' interests

were loyally and prudently served; and by failing to otherwise place the interests of the Plans'

participants above the interests of themselves and the Company with respect to the Plans'

investment in Merrill Lynch Stock.

221.    As a result of these Defendants' breach of their duty to avoid conflicts of interest,

the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries suffered

damages, the exact amount of which will be determined at trial.

222.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29

U.S.C. § 1109(a), the Defendants named in this Count are personally liable to restore the losses

to the Plans caused by their breach of the duty to avoid conflicts of interest as alleged in this

Count.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiff class representative on behalf of the Class; Declaring that Defendants, and each of them, are not entitled to protection under ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

B.    Declaring that Defendants have violated the duties, responsibilities, and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

C.    Compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, and to restore to the Plans all profits Defendants made through use of the Plans' assets, and to restore to the Plans all profits that the participants would have made had Defendants fulfilled their fiduciary obligations;

D.    Awarding actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.      Enjoining Defendants, and each of them, from any further
        violations of their ERISA fiduciary obligations;

F.      Requiring Defendants to appoint one or more independent
        fiduciaries to participate in the management of the Plans'
        investment in Merrill Lynch Stock;

G.      Awarding extraordinary, equitable, and/or injunctive relief
        as permitted by law, equity, and the federal statutory
        provisions set forth herein, pursuant to Fed. R. Civ. P. 64
        and 65;

H.      Awarding the Plans and/or Plaintiff and members of the
        Class, restitution, disgorgement, and/or other remedial
        relief;

I.      Awarding the Plans and/or Plaintiff and members of the
        Class pre-judgment and post-judgment interest, as well as
        their reasonable attorneys' fees, expert witness fees, and
        other costs; and

J.      Awarding such other relief as this Court may deem just and
        proper.

Dated: January 4, 2008                  Respectfully submitted,

                                        **MILBERG WEISS LLP**


                                        By: Lori G. Feldman (LF 3478)
                                        lfeldman@milbergweiss.com
                                        Arvind B. Khurana (AK 3643)
                                        akhurana@milbergweiss.com
                                        Sara E. Fuks (SF 6034)
                                        sfuks@milbergweiss.com
                                        Jennifer Sosa (JS 0324)
                                        jsosa@milbergweiss.com
                                        One Pennsylvania Plaza
                                        New York, New York 10119
                                        (212) 594-5300 (telephone)
                                        (212) 868-1229 (facsimile)

                                        ***Attorneys for Plaintiff***